```
             IN THE UNITED STATES DISTRICT COURT
           FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMUNICATIONS WORKERS OF       :
AMERICA, AFL-CIO, DISTRICT 13,  :
                                :
           Plaintiff,           :   CIVIL ACTION
                                :
      v.                        :   NO. 10-6840
                                :
VERIZON SERVICES CORP.,         :
et al.,                         :
                                :
           Defendants.          :
```

### ORDER

AND NOW, this 5th day of August, 2011, upon consideration of Plaintiff's Motion for Summary Judgment (Doc. No. 14), Defendants' Response in Opposition Thereto (Doc. No. 19), Defendants' Motion for Summary Judgment (Doc. No. 16), and Plaintiff's Response in Opposition Thereto (Doc. No. 18), and for the reasons set forth in the accompanying memorandum, it is hereby ORDERED as follows:

   1) Plaintiff's Motion for Summary Judgment is DENIED.

   2) Defendants' Motion for Summary Judgment is GRANTED, and Judgment is hereby entered in favor of the Defendants and against the Plaintiff in no amount.

**BY THE COURT:**

**/s/ J. Curtis Joyner**
_____
**J. CURTIS JOYNER, C.J.**

```
              IN THE UNITED STATES DISTRICT COURT
            FOR THE EASTERN DISTRICT OF PENNSYLVANIA

COMMUNICATIONS WORKERS OF      :
AMERICA, AFL-CIO, DISTRICT 13, :
                               :
          Plaintiff,           :     CIVIL ACTION
                               :
     v.                        :     NO. 10-6840
                               :
VERIZON SERVICES CORP.,        :
et al.,                        :
                               :
          Defendants.          :
```

## MEMORANDUM AND ORDER

**Joyner**, C.J.                                       **August     , 2011**

Plaintiff, Communications Workers of America (CWA), AFL-CIO, District 13, and Defendants, Verizon Pennsylvania, Inc., Verizon Delaware, Inc., and Verizon Services Corp.[1], each file a motion for summary judgment in their respective favor. The case was initiated by Plaintiff bringing a breach of contract claim on behalf of CWA Local 13500 and CWA Local 13100. (Pl.'s Mem., 3, Doc. No. 15). Plaintiff represented the aforementioned local unions in a series of collective bargaining agreements (CBAs) with Defendant, of which the agreement at issue was effective August 3, 2008 through August 6, 2011. (Pl.'s Mem., 3-4, Doc. No. 15). The primary issue is whether Defendant violated a contracted agreement with Plaintiff when the decision was made to

---

[1] As Defendants are all related corporate entities, they shall hereafter be referred to as a singular "Defendant."

1

provide more employees with Enhanced Income Security Plan (EISP) benefits than were covered in the declared "surplus."

## I. Facts

On June 30, 2000, Bell Atlantic merged with GTE and became known as Verizon. (Def.'s Statement of Undisputed Material Facts, ¶ 13). CWA and its affiliated Locals in District 13 have represented employees of Bell Atlantic, and later Verizon in Delaware and Pennsylvania since the 1990s. (Id., ¶ 14). The Income Security Plan, and Enhanced Income Security Plan provisions in the CBAs covering Locals 13000, 13500, 13100, 13101 (collectively "the Pennsylvania and Delaware CBAs") set forth a process by which the employers may reduce the size of their respective workforces. (Def.'s Statement of Undisputed Material Facts, ¶ 12). Since 1996, and currently, the amended CBA regarding EISPs between Pennsylvania Local 13500 and Verizon states in relevant part:

> 21.01 If during the term of this Agreement, the Company notifies the Union in writing that technological change (defined as changes in equipment or methods of operation) has or will create a surplus in any job title in a work location which will necessitate lay-offs or involuntary permanent reassignments of regular employees to different job titles involving a reduction in pay or to work locations requiring a change of residence, or if a force surplus necessitating any of the above actions exists for reasons other than technological change and the Company deems it appropriate, regular employees who have at least one (1) year of net credited service may elect, in the order of seniority, and to the extent necessary to relieve the surplus, to leave the service of the Company and receive Income Security Plan (ISP) and if applicable, during the term of this agreement, Enhanced Income Security Plan (Enhanced ISP) benefits described in this Section, subject to the following conditions:
>
> (a) The Company shall determine the job titles and work locations in which a surplus exists, the number of employees in such titles

> and locations who are considered to be surplus, and the period
> during which the employee may, if he or she so elects, leave the
> service of the Company pursuant to this Section.  Effective until
> August 8, 1998, the Company will offer Enhanced ISP in the
> circumstances described in Subsection 21.02(a) of this Section and
> may also offer Enhanced ISP in other circumstances if they choose
> to do so.  The Company may limit acceptances to the number of
> surplus and this Enhanced ISP offer would be in lieu of
> obligations, if any, the Company may have to offer regular ISP.
> Neither such determinations by the Company nor any other part of
> this article shall be subject to arbitration.
>
> (b) The number of employees who may make such election shall not
> exceed the number of employees determined by the Company to be
> surplus.
>
> (c) An employee's election to leave the service of the Company and
> receive ISP or Enhanced ISP payments must be in writing and
> transmitted to the Company within thirty (30) calendar days from
> the date of the Company's offer in order to be effective and it
> may not be revoked after such thirty (30) calendar day period.

(Def.'s Mem. in Support of Def.'s Mot., 5-6, Doc. No. 17). Delaware Local 13100 CBA Article 19.01 and the Income Security Plan, Enhanced Income Security Plan provisions in the contracts covering Locals 13000 and 13101, are identical except for some article reference numbers.  (Id., 6).

Though the CBAs say, "effective until August 8, 1998," the provision that follows remains effectual because each time Plaintiff and Defendant bargained a renewal of the CBAs, they executed a memorandum of understanding providing that each of the new collective bargaining agreements shall consist of the provisions of the existing agreements, as modified in the negotiations, and that all expiration dates would be updated unless the parties agreed otherwise.  (Def.'s Statement of Undisputed Material Facts, ¶ 25).

In 2010, Defendant along with other Verizon entities

3

determined that there was a surplus of approximately 12,000 employees across a broad area, which if not relieved would necessitate layoffs.  (Id., ¶ 37).  Per the EISP provisions in the collective bargaining agreements, Defendant notified Plaintiff of the surplus, and of their intent to offer supplemented, more generous EISP incentives to alleviate the surplus.  (Id., ¶ 38-39).  On April 21, 2010, Defendant entered into a Memorandum of Agreement with the CWA covering several bargaining units, including CWA Locals 13500 and 13100, creating a supplemented EISP incentive that was to be made available to employees on May 18, 2010.  (Id., ¶ 44-45).  Upon distribution, 561 eligible surplus employees within the Local 13500 and Local 13100 bargaining units applied to voluntarily resign from their positions with Defendant in exchange for the negotiated supplemented EISP benefits.  (Id., ¶ 58).

Despite a meeting on June 23, 2010 between Defendant and Plaintiff in which Plaintiff stated that it believed Defendant was required to seek Plaintiff's agreement before accepting any volunteers in excess of the prior stipulated surplus numbers, Defendant accepted all 561 offers from surplus employees in Locals 13500 and 13100.  (Id., ¶¶ 59-61).  Over 11,000 employees left the employ of Defendant and other Verizon entities as a result of the May 18, 2010 supplemented EISP, and pursuant to the Incentive Memorandum of Agreement, Defendant has not laid off any

4

Consultants or Service Representatives, and has announced that the surplus declared by the company in 2010 has been alleviated. (Id., ¶¶ 64, 66, 68).

In July 2010, both CWA Local 13500 and CWA Local 13100 filed grievances with Verizon, protesting the "Company Exceeding Announced Surplus." (Id., ¶¶ 69, 73). In September and October of 2010, both grievances were denied because it was Verizon's position that the Company had the flexibility to accept the over-subscription, and the sole discretion to determine and adjust the surplus numbers. (Id., ¶¶ 71-75). The last of the 561 EISP surplus beneficiaries from Locals 13500 and 13100 went off payroll on November 21, 2010, and on November 22, 2010, Plaintiff filed this lawsuit against Defendant. (Def. Mem. in Support of Mot. for Summary Judgment, 9, Doc. No. 17).

## II.  Legal Standard

Summary judgment is governed by Fed. R. Civ. P. 56, which states in pertinent part, "the court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). However, "the mere existence of some factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment." Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986). Summary judgment will only be

5

precluded by disputes over facts that have the potential to affect the outcome of the suit under governing law.  Id. at 248.  When considering a motion for summary judgment, the court must "view the facts in the light most favorable to the non-moving party, and make every reasonable inference in that party's favor."  Graphic Communications Conference v. Bucks County Courier Times, No. 06-5452, 2008 WL 3889591, at *1 (E.D. Pa. Aug. 18, 2008).

The same standards and burdens apply when the parties file cross motions for summary judgment.  Graphics Communications Conference, 2008 WL 3889591, at *2.  Cross motions for summary judgment must be considered separately because they,
> are no more than a claim by each side that it alone is entitled to summary judgment, and the making of such inherently contradictory claims does not constitute an agreement that if one is rejected the other is necessarily justified or that the losing party waived judicial consideration and determination whether genuine issues of material fact exist.

Id. (quoting Transportes Ferreos de Venezuela II CA v. NKK Corp., 239 F.3d 555, 560 (3d Cir. 2001); Rains v. Cascade Indus., Inc., 402 F.2d 241, 245 (3d Cir. 1968)).

"Although a collective bargaining agreement differs from an ordinary contract, the meaning of a collective bargaining agreement may be determined by applying general rules of contract law as long as federal labor law does not provide a conflicting rule."  Sheet Metal Workers Local 19 v. 2300 Group, Inc., 949 F.2d 1274, 1284 (3d Cir. 1991) (quoting Sheet Metal Workers Local

19 v. Keystone Heating & Air Conditioning, 934 F.2d 35, 40 (3d Cir. 1991)). The Court must deal with the question of law as to whether a contract term is clear or is conversely susceptible to reasonable alternative interpretations and therefore deemed ambiguous. Einhorn v. Fleming Foods, Inc., 258 F.3d 192, 194 (3d Cir. 2001). When ruling on ambiguity, the Court must take into account, "the contract language, the meanings suggested by counsel and the extrinsic evidence offered in support of each interpretation." Id. at 194-95. Extrinsic evidence has been deemed to include, "the structure of the contract, the bargaining history, and the conduct of the parties that reflects their understanding of the contract's meaning.' These basic principles of contract construction are not inconsistent with federal labor policy." Teamsters Industrial Employees Welfare Fund v. Rolls-Royce Motor Cars, 989 F.2d 132, 135 (3d Cir. 1993).

### III.  Discussion

Plaintiff contends in its motion for summary judgment that the Defendant entities violated the terms contained in the CBA under subsection b of the Income Security Plan, Enhanced Income Security Plan requiring that the number of employees accepted as EISP volunteers not exceed the number of surplus positions declared by the Company. Plaintiff's interpretation of the language of the provision restricts Defendant's methods for alleviating a surplus by requiring that surplus numbers be

calculated only with regard to specific positions at specific locations, and EISP applications not be accepted when they exceed these individualized numbers.  After analysis of the contract on its face, this Court finds Plaintiff's interpretation to be erroneous.

"Under Pennsylvania law, it is well established that the purpose of contract interpretation is to ascertain and effectuate the objectively manifested intentions of the contracting parties."  <u>Pension Fund for Nursing Homes and Health Care Employees v. Resthaven Nursing Centers</u>, No. 07-313, 2008 U.S. Dist. LEXIS 40612, at *10 (E.D. Pa. May 20, 2008).  Further, "[i]n determining the meaning of a contract, the initial resort should be to the four corners of the agreement itself."  <u>Id.</u> (<u>citing</u> <u>Washington Hospital v. White</u>, 889 F.2d 1294, 1300 (3d Cir. 1989)).

Article 21.01(a) of the Union/CWA Local 13500 and Verizon Pennsylvania, Inc. collective bargaining agreement states that, "the Company *may* limit acceptances to the number of surplus" (emphasis added).  (Doc. No. 15, 14).  This is not a mandatory declaration, as "may" is defined as, "[a]n auxiliary verb qualifying the meaning of another verb by expressing ability, competency, liberty, permission, possibility, probability, or contingency."  Black's Law Dictionary (6th Ed.) (<u>citing</u> <u>U.S. v. Lexington Mill & Elevator Co.</u>, 232 U.S. 399, 411, 34 S. Ct. 337,

58 L. Ed. 658 (1914).  Further, with regard to employee election to accept the EISP, Article 21.01(b) states that, "[t]he number of employees who make such election shall not exceed the number of employees determined by the Company to be surplus."  (Doc. No. 15, 14).  Plaintiff's interpretation of these two sections of the agreement would put them at odds with one another, and render the bargaining agreement meaningless.  However, "in making a determination concerning the clarity or ambiguity of the contract terms, the Court should avoid interpreting contractual language in a way that renders any term of the contract meaningless or superfluous."  Glenpointe Assocs. v. Regency Savings Bank, No. 06-1690, 2006 U.S. Dist. LEXIS 74996, at *14-15 (D.N.J. Sept. 25, 2006).  In order to avoid applying a meaning that would render a portion of the contract superfluous, the Court finds that each of the two aforementioned quotations deal with separate issues: the first regarding the Company's choice as to whether to accept more employees than a stipulated surplus number, and the second dealing with the inability of employees to oversubscribe to the surplus.

In furtherance of this notion, the contract bargained for by the parties also asserts that the Company may declare a surplus and offer EISPs when faced with the possibility of "lay-offs or involuntary permanent reassignments of regular employees to different job titles involving a reduction in pay or to work

9

locations requiring a change of residence." (Doc. No. 15, 14). The goal of these incentives is to entice enough employees to voluntarily forfeit their positions to avoid rearranging the company or downsizing the workforce without compensation. This goal was achieved, with over 11,000 employees accepting the EISP, and no layoffs occurring to date. (Def.'s Mem. in Support of Mot. for Summary Judgment, 16, Doc. No. 17). It is logical to presume from the face of the contract that a vast number of employees would choose a benefit package and severance from the company as opposed to merely being let go, and the contract is designed to protect the company from being obligated to provide EISPs to all of those employees who chose to accept the offer. Once the surplus is alleviated, it is left to the discretion of the company to determine if providing more EISPs would benefit or harm the company, and it is logical that the contract would empower it to act accordingly.

Additionally, the surplus was reported to be 12,000 employees, while just over 11,000 EISP applications were accepted by the company. While the individual job and location surplus numbers may have been exceeded in some regions and job positions, the Company stayed under overall surplus 'limit.' Regardless, exhibits 1-5 attached to Defendants' Memorandum in Support of Their Motion for Summary Judgment (Doc. No. 17) illustrate accepted bargaining history and prior EISP disbursement in which

the practice of providing more applicants with EISPs than a surplus declared available for individual jobs and locations.

The Court believes that a reasonable jury could rule in favor of Defendant, and therefore denies Plaintiff's motion for summary judgment. In turn, given the absence of a dispute of any material fact, the language of the collective bargaining agreement, and the extrinsic evidence offered in consideration of the agreement, the Court finds that no reasonable jury could find in favor of Plaintiff and that Defendant is entitled to judgment as a matter of law. Therefore, the Court grants Defendant's motion for summary judgment.

## IV. Conclusion

For all of the foregoing reasons, Plaintiff's Motion for Summary Judgment is denied, and Defendant's Motion for Summary Judgment is granted as set forth in the attached order.